[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-10196

_____

ESTATE OF JAMES P. KEETER, DECEASED,
GARRY L. HOLTON, JR. and
THOMAS W. SCHAEFER,
CO-EXECUTORS, and
JULIE L. KEETER,

Petitioners-Appellants,

*versus*

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.

_____

Petition for Review of a Decision of the
U.S. Tax Court
Agency No. 6771-16

_____

_____

No. 22-10197

_____

KAYLAN A. LEWIS,

Petitioner-Appellant,

*versus*

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.

_____

Petition for Review of a Decision of the
U.S. Tax Court
Agency No. 6772-16

_____

Before BRANCH and BRASHER, Circuit Judges, and WINSOR,* District Judge.

BRASHER, Circuit Judge:

This appeal turns on the meaning of the phrase "partner level determinations" in Section 6230(a)(2)(A)(i) of the now-repealed Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"). When the IRS adjusts the tax items of a partnership, these partnership-level changes often require corresponding adjustments to "affected items" on the individual partners' income tax returns. The IRS makes these resulting partner-level changes using one of two procedures. If adjusting a partner-taxpayer's affected item "require[s] partner level determinations," the IRS must send the taxpayer a notice of deficiency describing the adjustment to the taxpayer's tax liability, and the taxpayer has the right to challenge the adjustments in court before paying. If, on the other hand, adjusting the affected item does not "require partner level determinations," the IRS generally must make a direct assessment against the taxpayer, and the taxpayer may challenge the adjustment only in a post-payment refund action.

We must decide which procedure the IRS must apply to adjust the following affected items: (1) losses taxpayers claimed on sales of stock and euros distributed to them by a sham partnership as a liquidating distribution, and (2) itemized deductions dependent

_____

* Honorable Allen C. Winsor, United States District Judge for the Northern District of Florida, sitting by designation.

on those losses. Because making these adjustments requires an individualized assessment of each taxpayer's unique circumstances, we hold that they "require partner level determinations," mandating deficiency procedures. Because the IRS used that procedure and the Tax Court approved it, we affirm.

## I.

### A.

We begin by explaining the applicable statutory framework. Partnerships are not subject to federal income tax. I.R.C. § 701. Rather, a partnership's taxable items of income, gain, loss, deduction, and credit pass through to its partners, who must report their respective shares of those items on their own tax returns. *Id*. §§ 702, 704.

Still, a partnership must report its tax items on an informational return. *Id*. § 6031. And before 1982, the IRS had no way to correct errors on a partnership's informational return in one fell swoop. Instead, to adjust a partnership item—even one that pertained to all partners—the government had to pursue deficiency procedures against each partner individually. *Greenberg v. Comm'r*, 10 F.4th 1136, 1145 (11th Cir. 2021). Deficiency procedures required the IRS to issue a separate notice of tax deficiency to each partner, *see* I.R.C. § 6212(a), who could then challenge the deficiency amount before paying by filing a petition in the U.S. Tax Court, *id*. § 6213(a). This old scheme generated duplicative

proceedings and inconsistent treatment of partnership items between different partners. *See United States v. Woods*, 571 U.S. 31, 38 (2013).

To correct these defects, Congress enacted TEFRA, Pub. L. No. 97-248, 96 Stat. 648 (codified as amended at I.R.C. §§ 6221–6234 (1992 ed. and Supp. IV)).[1] TEFRA required the IRS to engage in a coordinated "two-step process" to determine the proper tax treatment of partnership matters. *Highpoint Tower Tech. Inc. v. Comm'r*, 931 F.3d 1050, 1053 (11th Cir. 2019).

At step one of TEFRA, the IRS adjusts "partnership items" relevant to the partnership as a whole in a single, unified proceeding. *See* I.R.C. §§ 6221(a), 6231(a)(3). Partnership items are taxable items "more appropriately determined at the partnership level than at the partner level," *id*. § 6231(a)(3), such as "[t]he partnership aggregate and each partner's share of . . . income, gain[,] loss, deduction, or credit of the partnership," Treas. Reg. § 301.6231(a)(3)–1(a). If the IRS disagrees with a partnership's reporting of partnership items, it initiates an audit against the partnership. I.R.C. § 6223(a)(1). And if the IRS determines that adjustments to partnership items are necessary, it issues a notice of final partnership administrative adjustment ("FPAA") to the partners informing them

---

[1] Congress prospectively repealed the TEFRA partnership procedures beginning in 2018. *See* Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 1101(a), 129 Stat. 584, 625. Because the events at issue in this appeal took place during the 1999–2003 tax years, TEFRA governs our analysis. All citations to the Internal Revenue Code and Treasury regulations refer to the versions applicable during that time.

of the adjustments. *Id.* § 6223(a)(2). If the partners dispute the adjustments, the designated "tax matters partner" may initiate a "partnership-level proceeding" in court. *See id.* § 6226.

At step two of TEFRA, the IRS must decide whether its partnership-level adjustments to "partnership items" require any individual partner-level adjustments to "affected items." *Sarma v. Comm'r*, 45 F.4th 1312, 1316 (11th Cir. 2022). Affected items are items reported on the individual partners' returns "that are affected by (but are not themselves) partnership items." *Woods*, 571 U.S. at 39 (citing I.R.C. §§ 6230(a)(2)(A)(i), 6231(a)(5)). Unlike disputes over partnership items, "which are addressed at the partnership level, issues relating to affected items are addressed at the individual partner level." *Monahan v. Comm'r*, 321 F.3d 1063, 1066 (11th Cir. 2003).

Under TEFRA, the IRS adjusts affected items partner-by-partner using one of two procedures. Which method applies depends on whether the affected items "require partner level determinations." I.R.C. § 6230(a)(2)(A)(i).

One procedure governs affected items that do not require partner-level determinations. For such items, the IRS may make a direct computational adjustment to the partner's return by applying the revised tax treatment of the partnership items to the affected item on the partner's return. *See id.* § 6230(a)(1); *Woods*, 571 U.S. at 39. The IRS then notifies the partner of the change via a "notice of computational adjustment." *See Ginsburg v. United States*, 17 F.4th 78, 81–82 (11th Cir. 2021). Taxpayers are not entitled to

challenge direct assessments before paying; instead, they may challenge the adjustments only in a post-payment refund action. *See* I.R.C. § 6230(a)(1), (c).

The second procedure, by contrast, applies when an affected item requires partner-level determinations. In this situation, TEFRA directs the IRS to make adjustments using its normal deficiency procedures. That is, the IRS must issue a "notice of deficiency" to the individual partner, who is entitled to a pre-payment forum to dispute the adjustments. *Id.* § 6230(a)(2)(A)(i); *see id.* § 6212(a).

With this procedural framework in mind, we turn to the case at hand.

## B.

The relevant facts are undisputed. The taxpayer-appellants in these consolidated appeals are Julie Keeter; the Estate of her deceased husband, James Keeter; and the Keeters' adult daughter, Kaylan Lewis. They participated in an abusive tax shelter known as "BLIPS"—a variation of the now-familiar "Son-of-BOSS" shelter. *See* IRS Notice 2000–44, 2000–2 C.B. 255 (classifying such schemes as illegal tax-avoidance transactions). "Like many of its kin, this tax shelter employs a series of transactions to create artificial financial losses that are used to offset real financial gains, thereby reducing tax liability." *Highpoint*, 931 F.3d at 1052 (quoting *Petaluma FX Partners, LLC v. Comm'r*, 591 F.3d 649, 650 (D.C. Cir. 2010), *abrogated on other grounds by Woods*, 571 U.S. 31). BLIPS participants "transfer . . . assets encumbered by significant liabilities to a partnership" with

the purpose of artificially increasing their "basis" in that partnership. *Id.* "Tax basis is the amount used as the cost of an asset when computing how much its owner gained or lost for tax purposes when disposing of it." *Woods*, 571 U.S. at 35. In the partnership context, "outside basis" refers to each partner's interest in the partnership, and "inside basis" refers to the partnership's basis in its own assets. *See id.* at 35–36. The partners in a BLIPS scheme evade tax liability by attaching their inflated outside basis to a liquidating distribution received from the sham partnership. When they sell the distributed assets, they generate artificial losses.

The taxpayers took those steps here. In 1999, Lewis and the Keeters created and funded single-member LLCs. The LLCs took out bank loans consisting of a principal amount and an additional "premium" amount. The taxpayers then transferred the LLCs' funds to a second entity—Sanford Strategic Investment Fund, LLC (a partnership for tax purposes, *see* I.R.C. § 761(a))—which assumed the loan obligations.

Normally, outside basis is equal to a partner's capital contributions minus any liabilities assumed by the partnership on the partner's behalf. *See* I.R.C. §§ 722, 752. But because Sanford's obligation to repay the loan premium was treated as contingent, the taxpayers did not consider it a liability for tax-basis purposes. By ignoring that liability when calculating basis, the taxpayers maintained an inflated outside basis in Sanford equal to their capital contributions plus the loan premium.

That same year, the taxpayers withdrew from the Sanford partnership. As part of a liquidating distribution, Sanford distributed stocks and euros to the taxpayers, which they sold or exchanged at various times between 1999 and 2003. Because of their inflated outside bases in Sanford, the taxpayers' sales of those distributed assets produced artificial losses approximately equal to the original loan premium, which the taxpayers claimed on their federal income tax returns.

*C.*

1.

The taxpayers apparently realized they were participating in a scam. So, to soften their expected run-in with the IRS, they voluntarily disclosed their BLIPS transactions as part of a pre-audit incentive program. Following these confessions, the IRS audited Sanford and determined the purported partnership was a sham. Accordingly, it disallowed Sanford's transactions as lacking economic substance.

Sanford's tax matters partner initiated a partnership-level proceeding against the IRS in federal district court, claiming Sanford's transactions were legitimate. The district court disagreed and upheld the IRS's relevant partnership-item adjustments. *See Shasta Strategic Inv. Fund, LLC v. United States*, No. C-04-04264-RS, 2014 WL 3852416, at *9 (N.D. Cal. July 31, 2014), *amended*, No. C-04-4264-RS, 2014 WL 5138027 (N.D. Cal. Sept. 11, 2014), *aff'd sub nom. Twenty-Two Strategic Inv. Funds v. United States*, 859 F.3d 684

(9th Cir. 2017), *aff'd sub nom. Sixty-Three Strategic Inv. Funds v. United States*, 692 F. App'x 432 (9th Cir. 2017).

2.

a.

After the partnership-level proceedings, the IRS made corresponding adjustments to the taxpayers' affected items at the partner level. For some of these affected items (like the taxpayers' distributive share of Sanford's income, gain, and loss), the IRS concluded that no "partner level determinations" were necessary. *See* I.R.C. § 6230(a)(2)(A)(i). Accordingly, the IRS adjusted those items directly and sent the taxpayers notices of computational adjustment. The taxpayers do not challenge the validity of these computational adjustment notices.

But the IRS believed partner-level determinations were needed to adjust the taxpayers' other affected items—(1) the losses they reported from the sales of the stock and euros they received from Sanford as a liquidating distribution and (2) itemized deductions that depended on those losses. So the IRS notified the taxpayers of adjustments to those items using notices of deficiency. These notices—which indicated that the taxpayers were liable for millions of dollars of unpaid taxes during the 1999 through 2003 tax years—are the subject of this suit.

b.

The taxpayers filed timely petitions in the Tax Court challenging the validity of the notices of deficiency. They did not dispute that they owed the money, just the procedure the IRS employed to obtain it. Specifically, the taxpayers claimed that the affected items adjusted in the deficiency notices did not "require partner level determinations" under Section 6230(a)(2)(A) because the taxpayers' returns provided the IRS "all of the factual information necessary to determine the taxpayers' correct tax liability." Thus, the taxpayers argued that the IRS should have instead assessed these items directly and issued notices of computational adjustment. And because the IRS issued the wrong notice, the argument went, the Tax Court lacked jurisdiction to redetermine the taxpayers' deficiencies.

The Tax Court disagreed and ruled for the IRS, upholding the deficiency notices and its jurisdiction to enforce them. First, the court concluded that the IRS had to make several partner-level determinations to adjust the taxpayers' reported losses from the sale of their liquidating distributions. These determinations included whether the stock and euros sold by the taxpayers between 1999 and 2003 were the same stock and euros Sanford distributed to them in 1999; the holding periods of those assets; the character of any gain or loss on their sale; and whether the taxpayers had any basis in those assets that was not attributable to their claimed basis in Sanford. Second, the Tax Court held that these same partner-level determinations were required to adjust the taxpayers' reported itemized deductions. Even though itemized deductions are statutorily prescribed mathematical computations, the applicable

statutory limitations depend on the taxpayers' adjusted gross incomes, which themselves depend on the IRS's adjustments to the taxpayers' reported losses.

The parties eventually agreed upon the taxes that the taxpayers owed, and the Tax Court accepted those agreements in stipulated decisions. The taxpayers appealed the stipulated decisions, and we consolidated their appeals.

## II.

The Tax Court's conclusions concerning jurisdiction and statutory interpretation are legal questions we review *de novo*. *Greenberg*, 10 F.4th at 1155.

## III.

The taxpayers argue that we should vacate the stipulated decisions because the Tax Court lacked subject matter jurisdiction over the IRS's deficiency notices. Specifically, the taxpayers contend that the IRS should have used the abbreviated procedures for computational adjustments to their individual returns, rather than employing deficiency procedures. In other words, the taxpayers are arguing that the IRS granted them more process than the law entitled them. The taxpayers seem to believe that, if they can convince us that the Tax Court lacked jurisdiction to enforce the deficiency notices, the IRS will be time barred from assessing their liabilities through the correct procedure. *See* I.R.C. § 6299(d)(2).

Although Congress repealed TEFRA, we still apply its provisions to disputes from taxable years before 2018. *See Highpoint*,

931 F.3d at 1052 n.2. To that end, we must answer four questions to resolve this appeal. First, do the taxpayers have standing to appeal the stipulated judgments of the Tax Court? Second, when does an affected item "require partner level determinations"? Third, did the affected items at issue require partner-level determinations? Fourth, is there any other basis to reverse on the specific facts of this record?

*A.*

We will start with the taxpayers' standing to appeal. The taxpayers appeal the Tax Court's redeterminations of their deficiencies, which the court made pursuant to stipulations entered between the taxpayers and the IRS. Although a party who consents to the entry of a stipulated judgment generally lacks standing to appeal it, there is an exception when the appellant is challenging the lower court's subject matter jurisdiction. *White v. Comm'r*, 776 F.2d 976, 977–78 (11th Cir. 1985). By attacking the IRS's statutory authorization to pursue deficiency procedures, the taxpayers say they are challenging the Tax Court's subject matter jurisdiction.

We believe the taxpayers have standing. The Tax Court has repeatedly and consistently held that "a valid notice of deficiency and a timely petition are essential to our deficiency jurisdiction and" that the court "must dismiss any case in which one or the other is not present." *Monge v. Comm'r*, 93 T.C. 22, 27 (1989); *see, e.g.*, *Pietanza v. Comm'r*, 92 T.C. 729, 735 (1989) ("It is well settled that to maintain an action in this Court there must be a valid notice of deficiency and a timely filed petition."); *Stamm Int'l Corp. v.*

*Comm'r*, 84 T.C. 248, 252 (1985) ("A valid petition is the basis of the Tax Court's jurisdiction. To be valid, a petition must be filed from a valid statutory notice."). Although we have never explicitly addressed the issue, we have tacitly accepted this proposition, parenthetically quoting the Tax Court's statement that its "jurisdiction to redetermine a deficiency in tax depends upon a valid notice of deficiency." *Sarma*, 45 F.4th at 1323 (quoting *GAF Corp. & Subsidiaries v. Comm'r*, 114 T.C. 519, 521 (2000)). And other circuits that have addressed the issue have agreed. *See, e.g.*, *Scar v. Comm'r*, 814 F.2d 1363, 1366 (9th Cir. 1987) ("The Tax Court has jurisdiction only when the Commissioner issues a valid deficiency notice, and the taxpayer files a timely petition for redetermination."); *Miles Prod. Co. v. Comm'r*, 987 F.2d 273, 275 (5th Cir. 1993) ("One of the statutory prerequisites to the exercise of the tax court's jurisdiction is a valid notice of deficiency." (citing *Logan v. Comm'r*, 86 T.C. 1222, 1226 (1986))). In light of these authorities, we agree with the taxpayers that they have standing to challenge the validity of the deficiency notices.

*B.*

We turn now to the parties' principal dispute: when does adjusting an affected item "require partner level determinations" under Section 6230(a)(2)(A) of TEFRA?

To answer this question, we begin with the text of the statute, assigning its terms their ordinary meaning at the time Congress adopted them. *United States v. Bryant*, 996 F.3d 1243, 1252 (11th Cir. 2021) (citing *Wis. Cent. Ltd. v. United States*, 138 S. Ct.

2067, 2074 (2018)). This ordinary-meaning canon is our "most fundamental semantic rule of interpretation." *Ruiz v. Wing*, 991 F.3d 1130, 1138 (11th Cir. 2021) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 69 (2012)). Yet the taxpayers dispute its application here. Because direct assessment is TEFRA's general rule for adjusting affected items, *see* I.R.C. § 6230(a)(1), the taxpayers urge us to "strictly" or "narrowly" construe Section 6230(a)(2)(A)'s deficiency-procedure exception for affected items requiring partner-level determinations.

We decline the invitation. Save for a handful of special circumstances, *see, e.g.*, *Dotson v. United States*, 30 F.4th 1259, 1264 (11th Cir. 2022) (statutory waivers of sovereign immunity), we do not adopt "strict" or "narrow" interpretations of statutes—even tax ones. *See* Scalia & Garner, *supra*, at 362 ("[A] tax statute should be given its fair meaning, and this includes a fair interpretation of any exceptions it contains."). "Our role," instead, "is to give . . . statute[s] a 'fair reading.'" *Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections*, 36 F.4th 1100, 1120 (11th Cir. 2022) (quoting Scalia & Garner, *supra*, at 3); *see Pictet Overseas Inc. v. Helvetia Tr.*, 905 F.3d 1183, 1191 (11th Cir. 2018) (William Pryor, J., concurring) ("'A text should not be construed strictly'; instead, 'it should be construed reasonably, to contain all that it fairly means.'" (quoting Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* 23 (1997))).

The parties focus their dispute on the meaning of the word *determinations* in the phrase "affected items which require partner-

level determinations." I.R.C. § 6230(a)(2)(A)(i). According to the taxpayers, the ordinary meaning of "determination" is "a judicial decision settling or ending a controversy or the resolving of a question by argument or reasoning.'" Under this construction, the taxpayers assert that partner-level determinations are required in only two circumstances: (1) when there is "an actual dispute" over an adjustment amount that requires judicial resolution, or (2) when the IRS does not already possess the factual information it needs to make the adjustment. The IRS, for its part, says a "determination" is "simply the act of deciding something officially," whether "legal or factual," and whether "by a court or administrative agency." Applying this interpretation, the IRS submits that an adjustment requires partner-level determinations under TEFRA if it depends on the individual taxpayer's unique circumstances. In other words, if an adjustment requires more than plugging partnership values into each partner's returns using a mathematical computation, the IRS believes TEFRA entitles the partners to a pre-payment forum to dispute the deficiency.

We think the IRS's reading is most loyal to the statute's text. The ordinary meaning of "determination" at the time of TEFRA's 1982 enactment is not limited to agency fact-gathering or judicial resolution of a concrete dispute. It refers, more broadly, to the process of reaching a conclusion. *See* Random House Dictionary of the English Language 541 (2d ed. 1987) ("the act of coming to a decision or of fixing or settling a purpose"); Black's Law Dictionary 405 (5th ed. 1979) ("The decision of a court or administrative agency."). We have previously held that "determine means 'establish or

ascertain definitely, as after consideration, investigation, or calculation.'" *Bourdon v. U.S. Dep't of Homeland Sec.*, 940 F.3d 537, 542 (11th Cir. 2019) (quoting The American Heritage Dictionary of the English Language 494 (5th ed. 2011)).

The taxpayers' proposed definition, however, would read atextual limitations into the word "determinations." Reaching conclusions does not invariably entail gathering new information; a decisionmaker may also reach a conclusion based on information in his possession. *See id.* ("[Dictionary] definitions show that 'determine' encompasses making a final decision—*and* the method for reaching that final decision (or, as the dictionaries put it, the thought, consideration, research, investigation, or calculation)."). Likewise, the ordinary meaning of determination is not limited to dispute resolution. To take a common example, insurers often make an independent determination that a doctor's prescription is "appropriate" and "medically necessary" before the provider will cover the prescription cost, even if there is no dispute to resolve. *See, e.g.*, 42 U.S.C. § 1396r-8(g)(1)(A). Further, the relevant determiners under Section 6230(a)(2)(A) are IRS agents, who conduct investigations and draw conclusions, not resolve disputes. *Compare* I.R.C. § 6212(a) ("the [Treasury] Secretary *determines* that there is a deficiency"(emphasis added)), *with* § 6213(a) ("the taxpayer may file a petition with the Tax Court for a *redetermination* of the deficiency" (emphasis added)).

The taxpayers offer two non-textual arguments to support their interpretation of Section 6230(a)(2)(A). Neither is persuasive.

USCA11 Case: 22-10196　　　Document: 47-1　　　Date Filed: 07/05/2023　　　Page: 18 of 33

First, the taxpayers argue that Treasury Regulation § 301.6231(a)(6)-1(a)(2) supports their interpretation. That regulation clarifies that the act of "substituting redetermined partnership items for the partner's previously reported partnership items . . . does not constitute a partner-level determination where the Internal Revenue Service otherwise accepts, for the sole purpose of determining the computational adjustment, all nonpartnership items . . . as reported" on the partner's individual return. According to the taxpayers, because the IRS accepted the items reported on their returns when adjusting their affected items, Section 301.6231(a)(6)-1(a)(2) teaches that those adjustments did not require partner-level determinations. But the regulation says no such thing. At most it means that, to adjust affected items, the IRS may use the information provided on the partners' tax returns.

Second, the taxpayers describe our adopted interpretation of Section 6230(a)(2)(A) as both unworkable and inconsistent with TEFRA's purpose. Of course, "we are not at liberty to rewrite [a] statute to reflect a meaning we deem more desirable" or to allow a theory about its "broad purposes" override its plain text. *United States v. Crape*, 603 F.3d 1237, 1244–45, 1247 (11th Cir. 2010) (cleaned up). But, in any event, we disagree with the taxpayers' characterizations on this score.

If workability is the goal, the taxpayers' interpretation still falls short. Their proposal is that no partner-level determinations are required whenever an affected-item adjustment (1) "is not subject to dispute (i.e., is not objected to or otherwise challenged" or

(2) "can be computed by the IRS agent after taking into account, and assuming the accuracy of, the reasonable universe of information within its possession (i.e., tax returns, informational returns, stipulations, settlement and closing agreements, sworn statements and disclosures)."

This test reeks of administrative difficulties. Most obviously, it is not at all clear how the IRS is to know whether its adjustments are "subject to dispute" before making them. Even more, the taxpayers' rule would burden the court in every case with reviewing the "universe of information" within the IRS's possession and deciding whether that information was sufficient on its own to adjust the challenged items. *See Tr. u/w/o Namm v. Comm'r*, 116 T.C.M. (CCH) 457, *11 n.15 (2018) (explaining that the necessity of partner-level determinations "is not determined by parsing the fine points of the partners' returns and hypothesizing what inferences the IRS might draw therefrom").

Our conclusion is also consistent with the Supreme Court's description of TEFRA's purpose. That purpose is not "to reduce the number of partner level proceedings" point blank, as the taxpayers would have us believe. Instead, "the precise evil that TEFRA sets out to remedy" is "duplicative proceedings, potentially leading to inconsistent results, *on a question that applies equally to all of the partners.*" *Woods*, 571 U.S. at 42 (emphasis added). Put differently, TEFRA's purpose is to unify the procedures for determining partnership items, *Bush v. United States*, 655 F.3d 1323, 1329 (Fed. Cir. 2011), not to prevent partner level determinations of individualized

questions about affected items. *See Desmet v. Comm'r*, 581 F.3d 297, 304 (6th Cir. 2009).

In fact, it is the taxpayers' interpretation that would undermine TEFRA's logic. The reason TEFRA permits the IRS to bypass standard deficiency procedures for affected-item adjustments that entail only a simple numerical substitution is because, for such adjustments, "the right to a hearing prior to an assessment of taxes that a notice of deficiency ordinarily provides is instead secured by granting every partner the right to participate in the partnership-level proceeding." *Olson v. United States*, 172 F.3d 1311, 1317 (Fed. Cir. 1999); *accord Callaway v. Comm'r*, 231 F.3d 106, 109 (2d Cir. 2000). The flow-through adjustments contemplated by Section 6230's direct assessment procedure are effectively settled at the partnership level, so pre-payment disputes over those adjustments can and should be resolved during those proceedings. But the same logic does not apply when affected-item adjustments require the IRS to do more than just import the partnership-level adjustments into each taxpayers' returns. In such a case, precluding deficiency procedures would deprive the taxpayers of any meaningful opportunity to challenge their asserted tax liability before paying.

We thus hold that the IRS makes "partner level determinations" under TEFRA when adjusting a partner's affected item requires the Service to inspect and account for information particular to that partner, even if the IRS already possesses that information and the taxpayer never disputes the adjustment. *Cf. Greenberg*, 10 F.4th at 1169 ("[T]he Commissioner must consider information

that relates to a particular taxpayer before it can be said that the Commissioner has 'determined' a 'deficiency' in respect to that taxpayer." (quoting *Scar*, 814 F.2d at 1368)). If, on the other hand, adjusting an affected item merely requires the IRS to substitute an adjusted partnership item for an item on the partner's return—and "there is nothing left to do but perform a calculation to determine tax liability"—partner-level determinations are unnecessary. *Bush*, 655 F.3d at 1330–31.

## C.

Having settled on the proper test to decide when affected-item adjustments "require partner level determinations" under Section 6230(a)(2)(A), our next task is to apply that test to the affected items in question. Those items are (1) the losses the taxpayers claimed on the sales of stock and euros they received from Sanford, a sham partnership, and (2) itemized deductions tied to adjusted gross income. We believe the IRS properly applied deficiency procedures to adjust these items.

## 1.

We start with the taxpayers' reported losses on their sales of euros and stock. To adjust these amounts, the IRS had to make the following partner-level determinations: whether the taxpayers sold the same euros and stock that they received from the sham partnership, the holding period for the stock, and the taxpayers' bases in the stock and euros. We address each determination in turn.

First, perhaps the most basic partner-level determination the IRS had to make to adjust the taxpayers' losses was whether the assets the taxpayers sold between 1999 and 2003 were the same assets Sanford distributed to them in 1999. As for the *euros*, the taxpayers' filings do not provide enough information even to guess whether the euros they received from Sanford in 1999 were the same euros they later sold. Consider the following image from the Keeters' 2000 joint returns:



Because this chart provides no information about the euros' holding period, and column (B) describes their acquired date as "VARIOUS," the IRS had no way to know whether the 38,650 euros the Keeters sold in 2000 were among those distributed to them by Sanford in 1999. Thus, even under the taxpayers' own proposed test—i.e., that partner-level determinations are required only when the IRS lacks the information necessary to make an adjustment—the taxpayers lose. The IRS had to conduct a partner-level determination to identify the subject euros.

Turning to the *stock*, the taxpayers' filings provided more information but not enough to avoid the IRS having to make a

partner-level determination. The partnership-level proceedings revealed that, in 1999, Sanford distributed 242 shares of Coca-Cola stock to the Keeters and 333 shares of UPS stock to Lewis. The taxpayers' tax returns demonstrate that the Keeters sold 242 shares of Coca-Cola stock in 1999, that Lewis sold 333 shares of UPS stock in 1999, and that the taxpayers had received those stock shares that same year. Based on that information, the IRS could presume that the stock the Keeters received from Sanford in 1999 was the same stock the Keeters sold that year. But the IRS still had to make that determination before adjusting the taxpayers' losses.

Second, having determined that the stock the taxpayers sold was the same stock that Sanford distributed to them, the IRS also had to determine the taxpayers' respective "holding periods" in the stock, as well as the character of any gain or loss they realized upon their sales of that stock. An asset's holding period refers to the time it is held by a taxpayer before sale. *See* I.R.C. §§ 1222, 1223. The holding period of a capital asset, like stock, determines the character of the gain or loss realized by the taxpayer from the asset's sale. *See* I.R.C. §§ 1222(1)–(4). Specifically, the sale of a capital asset with a holding period of one year or less produces a *short-term* capital gain or loss, while the sale of a capital asset with a holding period exceeding one year yields a *long-term* capital gain or loss. *Id.* The distinction matters for calculating tax liability because the applicable tax rate is often much lower for long-term capital gains and losses than for short-term capital gains and losses. Accordingly, to adjust losses claimed on sales of capital assets, the IRS must

normally determine how long the taxpayer held onto the asset before selling it.[2]

The IRS had to make these determinations for the taxpayers' stock sales. The partnership-level proceedings resolved only *Sanford's* holding period in the stock: those proceedings revealed that Sanford was organized in 1999 and that it distributed Coca-Cola and UPS stock to the taxpayers that same year. But that partnership-level determination does not resolve the *taxpayers'* holding period in that distributed stock—the taxpayers could have held onto the stock Sanford gave them for several days, several months, or several years. Thus, the IRS had to examine each taxpayer individually to determine the date on which he or she sold each share of his or her Sanford stock. From that date, the IRS could deduce the taxpayer's holding period in the stock. And from the holding period, the IRS could verify the character of the resulting gain or loss and tax it accordingly. These determinations were not especially challenging, but they were not mere across-the-board mathematical computations.

Third, before adjusting the taxpayers' reported losses on the sales of their stock and euros, the IRS needed to determine the taxpayers' adjusted bases in those assets. To be sure, there is no question that the taxpayers' *outside bases* in Sanford became zero as soon

---

[2] Under I.R.C. § 988(a)(1)(A), the gain or loss arising from the sale of foreign currency like euros is taxed at the short-term rate no matter how long the taxpayer held the currency. So the IRS had no need to determine the holding period of the euros.

as Sanford was disregarded for tax purposes; a taxpayer cannot have an interest in a nonexistent partnership. *Sarma*, 45 F.4th at 1321; *see Woods*, 571 U.S. at 42 (noting "the legal impossibility of any partner's possessing an outside basis greater than zero in a partnership that, for tax purposes, d[oes] not exist"). This adjustment required no partner-level determinations—we know each partner's outside basis is zero based on the partnership-level proceedings alone.

But a taxpayer's adjusted outside basis in a sham partnership does not determine his adjusted basis in property he received from the sham partnership. Under the Tax Code's partnership provisions, a *legitimate* partner's basis in property distributed to him in liquidation of a *legitimate* partnership is equal to the partner's adjusted basis in his partnership interest. I.R.C. § 732(b); *Woods*, 571 U.S. at 36. But when a partnership is deemed a sham, its purported partners are treated as holding the partnership's assets directly. *See Sarma*, 45 F.4th at 1323. In such a case, "the rules governing the income taxation of partners . . . do not apply." *Id.* Instead, the taxpayers' basis in property distributed to them by the sham partnership is calculated using the Code provisions applicable to ordinary taxpayers, which provide that the basis of an asset is its cost. I.R.C. § 1012(a). That the partners can have no interest in the sham partnership does not necessarily mean that the underlying property itself lacks substantive value. Instead, the IRS must examine each taxpayer's circumstances to determine the cost of the taxpayer's property at the time of its sale.

Having gone through this process, the IRS attributed greater-than-zero adjusted bases to the taxpayers' stock and euros at the time of their sale. As Lewis's deficiency notice reveals, for instance, the IRS determined Lewis had an outside basis of $7,970 in the euros she sold in 2000:

We have adjusted your Form 4797 for the ordinary loss from the sale of foreign currency, as shown in the accompanying computations:

| | Amount Realized per Exam | Basis per Exam | Gain/(Loss) per Exam | Gain/(Loss) per Return | Adjustment |
|---|---|---|---|---|---|
| Sale of Foreign Currency (1999) | $3,521 | ($3,536) | ($ 15) | ($2,011,545) | $2,011,530 |
| Sale of Foreign Currency (2000) | $7,334 | ($7,970) | ($636) | ($4,535,200) | $4,534,564 |
| Sale of Foreign Currency (2001) | $4,494 | ($4,982) | ($488) | ($2,834,895) | $2,834,407 |

Although the taxpayers insist that their zero outside bases in Sanford are conclusive of their bases in the euros and stock, the IRS determined otherwise.

### 2.

The taxpayers' reported losses are only one of the affected items the IRS adjusted using deficiency procedures. The other affected item is the taxpayers' itemized deductions. And we believe that adjusting that item also required partner-level determinations.

Certain expenses deducted as miscellaneous itemized deductions are deductible only if they exceed a certain threshold percentage of a taxpayer's adjusted gross income. *See, e.g.*, I.R.C. §§ 67, 68. The taxpayer's adjusted gross income depends, in turn, upon the taxpayer's recognized losses. Thus, because adjustments to the

taxpayers' losses from the sales of their Sanford assets require part-
ner-level determinations, resulting adjustments to the taxpayers'
itemized deductions depend on those partner-level determinations,
too. So the IRS correctly used deficiency procedures to adjust those
items.

We are not faced here with the more common situation
where itemized deductions adjust automatically as a result of part-
nership-level adjustments. In such a case, adjusting the deductions
will not require partner-level determinations because that adjust-
ment entails only a simple mathematical computation. *See* Treas.
Reg. § 301.6231(a)(6)–1(a)(2) (explaining that "the threshold
amount of medical deductions under section 213 that changes as
the result of determinations made at the partnership level" does
not require partner-level determinations). But where, as here, part-
ner-level determinations to affected items in turn affect itemized
deductions, adjusting those deduction amounts also depends on
the same partner-level determinations.

*3.*

We note that our conclusions are consistent with the only
circuits that have addressed a comparable question.

In *Desmet*, the Sixth Circuit addressed another Son-of-BOSS
scheme. A sham partnership distributed stocks to an S corporation
owned by the taxpayers, and the taxpayers then claimed large arti-
ficial losses on the S corporation's sale of those assets. 581 F.3d at
300. After disallowing the partnership's transactions, the IRS used
deficiency procedures to adjust the taxpayers' claimed losses. *Id.* at

300–01. The taxpayers sued, arguing that the deficiency notices were invalid because the loss deductions did not require partner-level determinations. *Id.* at 301. The Tax Court disagreed, and the Sixth Circuit affirmed. *Id.* at 301, 303. The Sixth Circuit rejected the taxpayers' argument that deficiency procedures were improper because "the IRS ha[d] all of the information . . . it needs from their . . . returns." *Id.* at 303. Partner-level determinations were necessary in any event "to determine 'the portion of the stock actually sold, the holding period for the stock, and the character of any gain or loss.'" *Id.* (quoting *Domulewicz v. Comm'r*, 129 T.C. 11 (2007)).

The Ninth Circuit adopted *Desmet*'s reasoning in *Napoliello v. Commissioner of Internal Revenue*, 655 F.3d 1060 (9th Cir. 2011). The facts were similar to those here. A Son-of-BOSS partnership distributed stocks to Napoliello as part of a liquidating distribution, and Napoliello claimed an artificial loss on his subsequent sale of the securities. *Id.* at 1062. The IRS later adjusted those losses using deficiency procedures, and the taxpayer sued, arguing that "the IRS should have made a direct computational adjustment instead." *Id.* at 1062, 1064. But the Ninth Circuit disagreed, holding that the loss adjustments required partner-level determinations. *Id.* at 1064. As in *Desmet*, "the IRS needed to determine the portion of the stock actually sold, the holding period for the stock, and the character of any gain or loss." *Id.* (quoting *Desmet*, 581 F.3d at 303) (cleaned up).

By contrast, the authorities on which the taxpayers rely are readily distinguished. For instance, the taxpayers invoke several decisions holding that no partner-level determinations are necessary

if the taxpayer-partner formally agrees to specific adjustments before the IRS assesses the taxpayer's liability. *See, e.g.*, *Olson*, 172 F.3d 1311; *Bush*, 655 F.3d 1323. In such a case, no determinations are necessary because the settlement resolves the deficiency amount. "[A]ll that remains is the *mechanical procedure of applying such settlement to the partner.*" *Bob Hamric Chevrolet, Inc. v. Comm'r*, 849 F. Supp. 500, 510 (W.D. Tex. 1994) (quoting *Harris v. Comm'r,* 99 T.C. 121, 126 (1992)); *accord Bush*, 655 F.3d at 1332. But no such pre-assessment settlement occurred in this case. The taxpayers here stipulated to the deficiency amounts only *after* the IRS made its adjustments. Pre-assessment-settlement cases are irrelevant on the issue at hand. *Desmet*, 581 F.3d at 304–05 (rejecting as "inapposite" the same pre-assessment-settlement decisions the taxpayers invoke here, explaining that "[w]here there is a settlement, the settlement itself resolves factual questions as to each partner"); *Napoliello*, 655 F.3d at 1064 (same).

The taxpayers also rely on authorities involving penalty assessments. *See Gosnell v. United States*, No. CV-09-01399-PHX-NVW, 2011 WL 2559832, at *12–13 (D. Ariz. June 28, 2011), *aff'd,* 525 F. App'x 598 (9th Cir. 2013). But TEFRA itself makes plain that "penalties relating to adjustments to partnership items are treated differently (i.e., not subject to Tax Court deficiency jurisdiction) even if they are affected items requiring partner level determinations." *Highpoint*, 931 F.3d at 1060; *see* I.R.C. § 6230(a)(2)(A) (deficiency procedures required to adjust "affected items which require partner level determinations (*other than penalties*, additions to tax, and additional amounts that relate to adjustments to partnership

items)" (emphasis added)). The affected items at issue here are not subject to that special treatment.

None of the authorities on which taxpayers rely addressed the ultimate question in this case—whether adjusting losses claimed on sales of property from a sham partnership requires part-ner-level determinations. Instead, all the on-point caselaw bolsters our conclusion. Because we conclude that the IRS was required to make partner-level determinations to adjust the taxpayers' re-ported losses and itemized deductions, the IRS properly employed deficiency procedures to make these adjustments.

*D.*

The taxpayers take three final shots to avoid affirmance. Each fails.

First, the taxpayers raise the so-called "claim-splitting doc-trine." When applicable, that prudential rule "requires a plaintiff to assert all of its causes of action arising from a common set of facts in one lawsuit." *Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1236 (11th Cir. 2021). Because the IRS employed deficiency procedures to adjust some affected items, but direct-assessment procedures to adjust others, the taxpayers complain that they will be forced to challenge the adjustments in separate actions and violate the claim-splitting prohibition.

But the claim-splitting doctrine is subject to exceptions. At least two apply here. First, the rule is inapplicable when splitting claims is authorized by an applicable statute. *See* Restatement

(Second) of Judgments § 26(a) (Am. L. Inst. 1980). And TEFRA authorizes—indeed, it requires—separate proceedings for affected items that require partner-level determinations and for those that do not. *See* I.R.C. § 6230(a). Second, the claim-splitting bar does not apply if asserting the claims in a single action would violate the limitations on the court's subject matter jurisdiction. *See* Restatement (Second) of Judgments § 26(a) (Am. L. Inst. 1980). As we have explained, employing the incorrect procedure for adjusting affected items strips the Tax Court of subject matter jurisdiction over those items.

Second, the taxpayers say that the IRS never spelled out to the Tax Court what specific partner-level determinations were needed to adjust the taxpayers' affected items. By failing to do so, the taxpayers contend that the IRS waived the argument that such determinations were required. And they argue that the Tax Court therefore violated the amorphous "party presentation principle" when it specified that necessary partner-level determinations included, among others, the identity, character, and holding periods of the stock and euros. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (recalling the general but "supple" rule that parties, not courts, "are responsible for advancing the facts and argument entitling them to relief" (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in the judgment))).

The argument is both incorrect and irrelevant. It is incorrect because the IRS's filings before the Tax Court clearly and

repeatedly specified each partner-level determination it made to adjust the taxpayers' affected items and why each determination was necessary. And it is irrelevant because the validity of the deficiency notices is determinative of the Tax Court's jurisdiction. As the taxpayers themselves point out elsewhere in their briefing, "subject-matter jurisdiction . . . can never be forfeited or waived." *United States v. Cotton*, 535 U.S. 625, 630 (2002); *see also United States v. Campbell*, 26 F.4th 860, 873 & n.6 (11th Cir. 2022) (en banc) (describing questions of subject matter jurisdiction as "limited exceptions" to the "principle of party presentation").

Third, after the parties submitted their opening briefs, the taxpayers filed a motion to supplement the record on appeal. They seek to introduce, among other records, a copy of their Announcement 2002-2 disclosures as well as additional excerpts of their relevant tax returns. According to the taxpayers, these documents confirm that the IRS possessed all the information necessary to assess the taxpayers' liabilities directly, obviating any need for partner-level determinations.

We deny the taxpayers' motion. Although we have the authority to enlarge the record on appeal to include material not before the lower court, we exercise this authority only "in exceptional circumstances." *Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1288 (11th Cir. 2022). A primary factor we consider is whether the proffered material would be dispositive of the issues on appeal. *See CSX Transp., Inc. v. City of Garden City*, 235 F.3d 1325, 1330 (11th Cir. 2000) (citing *Dickerson v. Alabama*, 667 F.2d 1364, 1367 (11th Cir.

22-10196                Opinion of the Court                33

1982)); *Young v. City of Augusta ex rel. DeVaney*, 59 F.3d 1160, 1168 (11th Cir. 1995) (citing *Ross v. Kemp*, 785 F.2d 1467, 1475 (11th Cir. 1986)). And because we hold that the IRS correctly followed the deficiency procedures even if the IRS possessed all the information needed to calculate the taxpayers' liabilities, additional evidence that the IRS did, in fact, possess that information is inconsequential.

## IV.

The Tax Court is **AFFIRMED** and the taxpayers' motion to supplement the record on appeal is **DENIED**.